**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LISA BETTS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. |
| | ) | |
| v. | ) | Judge |
| | ) | |
| OPTION CARE ENTERPRISES, INC., | ) | Jury Trial Demanded |
| WALGREENS COMPANY, AND MADISON | ) | |
| DEARBORN PARTNERS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff, Lisa Betts, by and through her attorneys, Pedersen & Weinstein LLP, for her Complaint against Defendants, Option Care Enterprises, Inc., Walgreens Company, and Madison Dearborn Partners, LLC, states as follows:

## NATURE OF ACTION

1.      Plaintiff brings this action under federal and state law to challenge Defendants' unlawful discrimination against her based on gender, including the discriminatory payment of wages.  Plaintiff also seeks relief under federal and state law for the retaliation she suffered as a result of opposing Defendants' unlawful conduct.

## JURISDICTION AND VENUE

2.      Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343 and principles of pendent and supplemental jurisdiction.

3.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a).

## PARTIES

4.      Lisa Betts ("Plaintiff") is a former employee of Option Care Enterprises, Inc., Walgreens Company, and Madison Dearborn Partners, LLC (collectively referred to herein as "Defendants" or "the company"). She began her employment in July 2009 and was fired unlawfully in April 2017.

5.      Defendant Option Care Enterprises, Inc. ("Option Care") provides medical infusion services to patients in their homes and other alternate treatment locations. It is a privately held company owned by Walgreens Company and Madison Dearborn Partners, LLC. Option Care is headquartered in Bannockburn, Illinois and operates pharmacies and treatment sites across the country. It has approximately 5,000 employees, and, upon information and belief, generates annual revenues of approximately $1.5 billion.

6.      Defendant Walgreens Company ("Walgreens") provides pharmacy, health and wellness services throughout the United States and its territories. It employs over 235,000 people and in its 2017 fiscal year generated $118.2 billion in sales.

7.      Defendant Madison Dearborn Partners, LLC ("MDP") is a private equity firm based in Chicago, Illinois. Since its formation in 1992, MDP has raised seven funds with aggregate capital of approximately $23 billion and has completed approximately 130 investments.

8.      At all times relevant to this Complaint, Defendants – individually and collectively – employed more than 15 employees and were engaged in an industry affecting commerce.

## FACTUAL ALLEGATIONS

*Plaintiff's Background*

9.      Plaintiff has an extensive background in the healthcare industry.  In addition to earning a doctorate degree in pharmacy, Plaintiff has spent over 25 years working in the medical field.  During her career, Plaintiff has published journal articles on pharmacology topics and significantly, in 2004 she cofounded one of Defendants' predecessor companies, a home infusion company based in Lombard, Illinois.

10.      Plaintiff's company specialized in immune globulin ("IG") therapy and was highly successful; within 5 years it was generating approximately $30 million in annual revenue.

11.      In time, Plaintiff's company caught the attention of Walgreens, which purchased it in 2009 and requested Plaintiff and her business partner to stay on for at least two years to oversee its continued success.  Walgreens operated the company under the name Walgreens Infusion Services.

12.      In 2015, Walgreens sold its majority ownership interest in the company to MDP (although Walgreens retained a minority interest) and the company was renamed Option Care.

*Plaintiff's Employment With Defendants*

13.      Following Walgreens' purchase of Plaintiff's company and its request that she stay on for at least two more years, it hired Plaintiff to be the General Manager for the Lombard facility.  In that role, Plaintiff's job duties included overseeing all operations of the facility and helping to grow the IG program into the largest revenue generating infusible therapy for the company.

14.      Following the two-year retention period, the co-founder of Plaintiff's business left the company and Plaintiff became the National Director of IG.  In that role, Plaintiff oversaw all

3

operations and sales for the niche market drug.

15.     Over the years, until the fall of 2016, Plaintiff's job remained relatively the same and she enjoyed immense success in her role.  To be sure, under Plaintiff's leadership, Defendants' revenues for IG therapies increased from $64 million a year to $420 million a year and she built the largest dedicated IG Program in the country.

16.     Further, in her most recent role at the company, Plaintiff significantly grew the two product lines she oversaw, which represented over $550 million in revenue, and she oversaw the unprecedented accreditation score of 100% from a national accreditation organization for specialty pharmacies for all three of Defendants' specialty centers, an accomplishment that no other company has ever attained.  Plaintiff also helped create and design a data outcome IG software program for Defendants that was published in the Journal of Neurology.

17.     In addition, in early 2017, before Plaintiff complained of gender discrimination and sexual harassment, Defendants' Chief Operating Officer and Plaintiff's direct supervisor gave Plaintiff a performance evaluation in which he found her work to be "completed satisfactorily."

18.     In sum, Plaintiff enjoyed an excellent reputation with regard to the high quality of her work and conscientious devotion to her job, and based on her experience and qualifications, she had every reason to anticipate a long and successful career with Defendants. Notwithstanding her impressive job performance, however, and as described in further detail below, Defendants subjected Plaintiff to gender discrimination and retaliation and ultimately forced her out of the organization unlawfully.

4

***Defendants Discriminated Against Plaintiff Because Of Her Gender***

19.     Despite all of Plaintiff's accomplishments and contributions to the company, Defendants discriminated against Plaintiff because of her gender.  Defendants' discriminatory treatment affected virtually every aspect of Plaintiff's employment and included, but was not limited to, the examples set forth below.

*Defendants Replaced Plaintiff With A Less Qualified Male Employee And Paid Him More*

20.     While Plaintiff experienced gender discrimination for several years during her employment, Defendants' discrimination against her escalated in September 2016.  At that time, Defendants surreptitiously promoted a man (who had only recently been hired) to replace Plaintiff in the position she had held since 2011.

21.     In addition to giving this male employee, Steven Hess ("Hess"), Plaintiff's job, Defendants also paid Hess, who was significantly less qualified than Plaintiff and had no experience in IG or infusion drugs, more than they paid Plaintiff for doing the same work.  More specifically, when Defendants moved Hess into Plaintiff's job, Defendants paid him $50,000 more in annual base salary than they paid Plaintiff for doing the same job.  Upon information and belief, Defendants also paid Hess a yearly bonus that was more than twice the bonus they paid Plaintiff.

22.     In addition to the discriminatory wages, Defendants also gave Hess preferential treatment with respect to his title upon hiring him.  Defendants immediately gave him the more prestigious title of Vice President while Plaintiff held the lower title of Director.

*Defendants Allowed The Male Employee To Engage In Unlawful Conduct*

23.     In addition to the pay and title disparities, Defendants allowed the male employee who replaced Plaintiff to engage in gross misconduct, including sexual harassment, without

5

repercussion.  Examples of Hess' misconduct in this regard include, but are not limited to, the following:

a)      Hess openly directed offensive comments of a sexual nature to Plaintiff. For example, Hess once told Plaintiff that he wanted to "spoon" with her. On another occasion, in the presence of another employee, Hess said that he and Plaintiff were going to make love.

b)      Hess brazenly made offensive comments of a sexual nature to at least one other female employee.  More specifically, Hess asked a female employee about her boyfriend and then, while making an obscene gesture with his hand and fingers, said, "Oh, you have a fuck buddy," or words to that effect.  When the female employee expressed offense to his comment, Hess said, "We're at an after-hours event so you can't report me, plus I'm good friends with [the Senior Vice President of] Human Resources," or words to that effect.

c)      Hess was otherwise openly disrespectful to women with Defendants' knowledge and assent.  For example, during his interviews with Defendants, Plaintiff was told to interview Hess (in hindsight, she believes this was a formality and that Hess had actually already been hired and offered her job) and in that meeting, Hess repeatedly disparaged another female employee, making comments that "she sucks" and "she doesn't know anything," or words to that effect.  Plaintiff voiced concern to her supervisor about Hess' comments about her female colleague, but her concerns were ignored.

d)      Hess was allowed to mistreat other employees who are protected by law. For example, he mocked an Asian employee for her accent and he mimicked a disabled person at a business meeting, behavior which Plaintiff found particularly offensive since she has a son with cerebral palsy.

e)      Throughout all these transgressions, Hess bragged he could engage in such behavior because of his close personal relationship with Mike Rude ("Rude"), the Senior Vice President of Human Resources.  To be sure, Hess had such little concern that he would ever be reprimanded for his behavior that Plaintiff once heard him yelling at a female human resources representative. When Plaintiff commented that he could not talk to human resources that way, Hess responded by saying, "I just did," and later told Plaintiff, "I told you, I'm friends with Mike Rude and he would never write me up," or words to that effect.

24.     Defendants otherwise allowed Hess to undermine Plaintiff's authority and

standing within the organization. For example, Hess ignored Plaintiff's calls, text messages and emails, as well as her invitation to participate in conference calls, thereby indicating that he did not value her work or think it important enough to even confer with her on business-related matters.

25. At other times, Hess was aggressive and hostile toward Plaintiff without cause or provocation. Hess also publicly disparaged Plaintiff to her subordinates during one conference call he chose to attend.

*Defendants Moved Plaintiff To A New Role And Put Unreasonable Expectations On Her*

26. After Defendants removed Plaintiff from her position so they could give her job to Hess, Defendants reassigned Plaintiff to the position of Vice President of Specialty Programs and held her to unreasonable performance expectations.

27. More specifically, Defendants told Plaintiff it expected her to increase revenues by over 15% within the next calendar fiscal year, under threat of termination, even though no one had ever attained that level of growth within one fiscal year.

28. Moreover, Defendants made several decisions in 2017 that negatively affected the company's market share and interfered with Plaintiff's efforts to increase revenues. For example, Defendants' executive management team (which did not include Plaintiff) decided that the company would no longer serve any immunoglobulin patients who carried a Medicare B plan, a decision that significantly reduced Defendants' market share and drove patients to competing companies.

29. Similarly, Defendants also decided to switch all patients who received a particular medication to another drug that was more profitable to the company. Patients whose doctors disagreed with this decision were simply transferred to another provider, thereby further

reducing the company's market share.

30. In addition, and as described below, Defendants also fired a female employee – whose children received Defendants' services – because of the high cost of covering her family's medical care. After firing the female employee, her children transferred to another company for treatment, a company that competes with Defendants, and this also caused a significant reduction in Defendants' sales and market share.

31. Despite setting patently unreasonable sales goals while simultaneously damaging sales, Defendants unjustly criticized Plaintiff on a weekly basis when revenue did not grow at the high rate they set (although Plaintiff did increase sales significantly). When Plaintiff tried to discuss the issues with John Rademacher ("Rademacher"), the Chief Operations Officer and one of her direct supervisors, he was dismissive and disinterested in speaking with her about them.

32. Further, while holding Plaintiff to unreasonable performance expectations not placed on men and making decisions that adversely affected the company's market share, Defendants simultaneously took away Plaintiff's administrative support. More specifically, Defendants took away Plaintiff's technical assistant and data support and gave them to Hess. Defendants also announced that they planned to take Plaintiff's office away from her and give it to Hess.

33. The cumulative effect of Defendants' actions was to demonstrate clearly that they valued the careers of men more than those of women.

_Defendants Espoused And Expressed Stereotypical Views of Working Women_

34. As further discrimination – and as further evidence of the unlawful motives behind Defendants' adverse actions against Plaintiff – Defendants subjected Plaintiff to demeaning treatment based on blatant gender stereotypes about women's desire to work. For

8

example, when Plaintiff once asked for a raise, Ted Raad, the Chief Marketing Officer and one of Plaintiff's direct supervisors, asked her why she needed more money since she had done well as a result of selling her company to Option Care.

35.     Similarly, Paul Mastrapa ("Mastrapa"), the Chief Executive Officer, once commented on Plaintiff continuing to work when she did not need the money.

36.     In contrast, such comments were not made to or about male employees who chose to work while not financially required to do so, including several who accepted lucrative buyout packages from a previous employer before Defendants hired them.

*Defendants Discriminated Against Plaintiff With Respect To Wages*

37.     In addition to paying Hess more than they paid Plaintiff for doing the same job, Defendants otherwise discriminated against Plaintiff with respect to wages.  For example, between 2009 and early 2016, Plaintiff did not receive a single pay raise despite her exemplary job performance.  Upon information and belief, similarly situated men were paid more than Plaintiff was paid and also received raises over the years.

38.     Plaintiff was also denied the opportunity to invest in the company when Walgreens sold its majority interest to MDP in 2015.  In sharp contrast, Defendants offered the opportunity to invest in the company to lower level male employees and even to Plaintiff's former male partner who had been gone from the company for years at that point.

39.     For further example, when Plaintiff was taken out of her job in 2016 and placed in the Vice President of Specialty Programs position, she received a nominal pay increase.  Plaintiff challenged the small increase and while Defendants ultimately increased it a bit (although it was still less than what Defendants were paying Hess), they also threatened Plaintiff that if she wanted more money, she would have to leave the company.

40.     As noted above, in contrast to how she was treated, Plaintiff believes that her male colleagues received higher and more frequent pay raises over the years and that her small increase in 2016 was far below what men with the Vice President title earned, including Hess.

41.     Upon information and belief, Defendants similarly paid other women less than their male counterparts.

*Defendants' Treatment Of Plaintiff Was Consistent With Its Treatment Of Other Women*

42.     Defendants' mistreatment of Plaintiff was consistent with Defendants' mistreatment of other female employees.  Similarly, Defendants' tolerance of Hess' misconduct was consistent with Defendants' tolerance of misconduct by other male employees.

43.     For example, Defendants once allowed a male employee to use company property and company time to exchange sexually explicit messages with a woman.  Worse, the messages – that included statements such as a reference to a "kissable" vagina – were also sent as a group text to various clients of Defendants.  Not only was the male employee not fired over this, but when Plaintiff reported the misconduct to management, Defendants actually chastised her for raising her concerns.

44.     Moreover, when another female employee subsequently asserted a claim against Defendants for gender discrimination and described the texting incident in her claim, Rude contacted Plaintiff to ask her about it.  Plaintiff told Rude what had happened and also mentioned still having the text messages at issue.  Rude then told Plaintiff to send him the texts and directed her to delete them after sending them to him.  Plaintiff understood that Rude was more interested in protecting the company and the male employee than he was in remedying the problem.

45.     As yet another example of Defendants' unlawful conduct toward women, in late 2016, Defendants fired a female employee with two small children who had serious illnesses.

Defendants fired her because of the escalating medical costs of caring for her children.

46.     Plaintiff opposed the termination of this female employee and suggested instead that Defendants fire an underperforming man in the same position as the mother of the sick children and who actually was paid more than the female employee.  Plaintiff discussed the situation with Rademacher, who was furious with her for challenging the decision.

47.     Defendants rejected Plaintiff's proposal and fired the female employee, while retaining the lower performing – yet higher paid – male employee.

48.     Plaintiff later learned following her discussion with Rademacher that Rude told employees in the Bannockburn, Illinois office that the company's medical costs were high because of the female employee and her children, but that the company had "a plan to address it."  The "plan" was to simply fire the female employee.

***Plaintiff Opposed The Discrimination, But To No Avail***

49.     Following some of the incidents described above, Plaintiff opposed the unlawful discrimination, but to no avail.  For example, in addition to protesting Hess' blatantly discriminatory conduct to him directly, Plaintiff reported it to Chief Operations Officer Rademacher and to Chief Executive Officer Mastrapa.

50.     Plaintiff further reported that other employees were afraid to come forward because of Hess' close friendship with Rude.

51.     Plaintiff also voiced her concerns over other issues described above, including Defendants' decision to fire a female employee in late 2016 because of the costs associated with insuring her sick children and Hess's discriminatory conduct toward an Asian employee and a disabled employee.

11

52.     Given her unique history and accomplishments with the company, Plaintiff had hoped her complaints would be taken seriously and that Defendants would address the problems appropriately.  They did not.  The discriminatory behavior continued and in response to her complaints about Hess, Rademacher simply told Plaintiff she needed to figure out a way to get along with him.  Similarly, while Mastrapa said he would investigate her concerns, to Plaintiff's knowledge, he did nothing and no disciplinary action was taken against Hess for any of his misconduct.

***Defendants Retaliated Against Plaintiff For Her Opposition To Their Unlawful Conduct***

53.     As a result of Plaintiff opposing Defendants' unlawful discriminatory conduct, and as further discrimination, on April 18, 2017, Defendants abruptly fired Plaintiff.

54.     Defendants then tried to secure a release from Plaintiff of all her claims in exchange for a nominal severance.

55.     Defendants told Plaintiff she was being fired because her "heart is not in it anymore," or words to that affect.  Given recent events, Plaintiff understood the statement to be a reference to the fact that she refused to condone the company's discriminatory practices.

56.     To be sure, apart from being an odd reason to fire one of the most successful employees in the company, Defendants' statement that they fired Plaintiff because "her heart is not in it anymore" is completely untrue, as evidenced by Plaintiff's continued and passionate dedication to helping patients and the company.  Indeed, Plaintiff had recently been asked to speak at a national event highlighting the life-saving effects that the drug she helped develop has on sick children and adults.  She also recently had led the development of an innovative software program to revise Defendants' formulary management, taking into account all their patients, products and payors, to ensure the company met its aggressive revenue goals.

57.     As yet further evidence of her dedication and outstanding job performance, Plaintiff had recently been recognized at the area Vice President Meeting for being "passionate and engaged" for the outstanding accreditation scores she obtained for the company and she received a plaque from her team praising her for her engagement, excellence and quality.

58.     Defendants subsequently offered different and inconsistent reasons for firing Plaintiff.  After first claiming that Plaintiff was fired because "her heart is not in it anymore," Defendants then claimed, also falsely, that they fired Plaintiff due to a reduction in force.

59.     Subsequent to that explanation, Defendants then claimed – also falsely – they fired Plaintiff for poor performance, as a result of the company losing market share under her leadership.

60.     In light of the highly suspicious timing of Plaintiff's termination and Defendants' baseless, inconsistent and shifting explanations for firing her, there is no question that Defendants fired Plaintiff unlawfully because of her gender and opposition to unlawful conduct.

61.     Moreover, on the same day they fired Plaintiff, Defendants also fired the woman who witnessed Hess's offensive comment to Plaintiff described in paragraph 23(a) above. Plaintiff had identified this witness to Hess's misconduct before she was fired and does not believe the witness' termination was coincidence but instead a further attempt by Defendants to overlook and cover up sexual harassment.

***Defendants Subjected Plaintiff To Post-Employment Discrimination and Retaliation***

62.     Following her unlawful termination, Defendants continued to subject Plaintiff to discrimination and retaliation.

63.     For example, Defendants had required Plaintiff to sign a non-compete during her employment.  After they fired her, and even though Defendants knew the agreement was likely

unenforceable, they threatened Plaintiff that they would sue her if she tried to work in the industry again before the non-compete agreement expired. Defendants made this threat to Plaintiff immediately upon firing her and repeated it thereafter.

64. In contrast, and upon information and belief, Defendants did not similarly threaten male employees and/or employees who did not complain about discrimination when they left the company, including Hess.

65. Defendants' threats adversely affected Plaintiff's job search efforts and prevented her from working until the non-compete agreement expired after one year.

*All Three Named Defendants Were Plaintiff's Employer*

66. All three named Defendants were Plaintiff's employer and made decisions related to her employment, compensation and termination.

67. At all times relevant to this Complaint, Walgreens was a full or partial owner of Option Care. From the beginning of Plaintiff's employment until 2015, Walgreens owned 100% of Option Care; after 2015, it owned 49%.

68. Similarly, from 2015 on, MDP has owned 51% of Option Care.

69. Walgreens was involved in making decisions related to Plaintiff's employment and compensation. It set her salary when it bought her company and then hired her in 2009, and it otherwise determined her role and responsibilities going forward. To be sure, while Walgreens created a national position for Plaintiff's male business partner and co-owner, Walgreens placed Plaintiff in charge of operations at the Lombard, Illinois facility.

70. Further, from 2009 until 2015 (when Walgreens sold its majority stake to MDP), Walgreens did not give Plaintiff a single pay raise despite her exemplary job performance.

71. In addition to the foregoing, Walgreens' personnel were otherwise involved in

14

decisions regarding Plaintiff's employment and benefits. For example, after 2015, Option Care's board has been comprised partly of Walgreens employees. During board meetings, Option Care's liabilities and internal issues are discussed and decided upon, which include various employment matters and presumably the report that Plaintiff made to CEO Mastrapa shortly before she was fired about gender discrimination and sexual harassment. Decisions made by the board, including decisions on how to handle Plaintiff's claims or whether or not to fire her, would necessarily include decisions made by Walgreens employees.

72.     Similarly, due to its majority ownership, MDP is actively involved with Option Care and its operations. The majority of Option Care's board is also comprised of MDP employees and significantly, Option Care's CEO who fired Plaintiff (Mastrapa) was at all relevant times a member of MDP's board of directors and reported directly into MDP.

73.     Further, during board meetings, Option Care's liabilities and internal issues are discussed and decided upon, which include various employment matters and presumably the report that Plaintiff made to Mastrapa shortly before she was fired about gender discrimination and sexual harassment. Decisions made by the board, including decisions on how to handle Plaintiff's claims or whether or not to fire her, would necessarily include decisions made by MDP employees.

74.     MDP was otherwise involved in making decisions related to Plaintiff's employment and compensation. For example, in 2015, as MDP was acquiring Option Care, it offered an equity "buy-in" to certain people. As described herein, Plaintiff was denied the opportunity to invest in the company while lower level male employees – and even Plaintiff's former male partner who had been gone from the company for years – were invited to invest.

75.     Further, both Walgreens and MDP adopted entirely Option Care's position

statement submitted to the EEOC addressing the substance of Plaintiff's claims. This is further evidence that they acted jointly with Option Care with regard to those claims.

***Defendants Failed to Exercise Reasonable Care To Prevent and Correct Unlawful Conduct***

76.     Defendants' management directed, encouraged, and participated in the above-described unlawful conduct.

77.     The discrimination and retaliation described above was consistent with Defendants' standard operating procedure.

78.     Defendants acted with malice or with reckless indifference to Plaintiff's federally and state protected rights.

***Plaintiff Timely Filed A Charge Of Discrimination And Unlawful Retaliation***

79.     Plaintiff timely filed a charge of discrimination and unlawful retaliation against Defendants with the EEOC.

80.     At Plaintiff's request, the EEOC subsequently issued Plaintiff a Notice of Right to Sue so she could pursue her claims in court.

81.     The EEOC cross-filed Plaintiff's charge of discrimination with the Illinois Department of Human Rights ("IDHR") pursuant to the work-sharing agreement between the EEOC and IDHR. Plaintiff asked the IDHR to adopt the EEOC's determination (alternatively it could conduct its own investigation which must occur within 365 days of the EEOC's determination), pursuant to the 2011 amendments to the IHRA (Public Law 97-0596, 775 ILCS 5/7A-102(A-1)(3)). On May 29, 2018, the IDHR adopted the EEOC's determination and issued an order of closure, giving Plaintiff the right to pursue her state law claims in court.

***Plaintiff Suffered Damages***

82.     As a direct result of Defendants' unlawful conduct, Plaintiff has suffered extreme

emotional distress.

83.     Plaintiff has lost wages, compensation and benefits as a result of Defendants' unlawful conduct.

84.     Plaintiff's career and reputation have been irreparably damaged as a result of Defendants' unlawful conduct.

85.     Plaintiff suffered embarrassment and humiliation as a result of Defendants' unlawful conduct.  Plaintiff suffered loss of enjoyment of life, inconvenience and other non-pecuniary losses as a direct result of Defendants' unlawful conduct, as well as incurring attorneys' fees and costs.

***Punitive Damages***

86.     Defendants acted and/or failed to act with malice or willfulness or reckless indifference to Plaintiff's rights.  The conduct alleged herein was willful and wanton and justifies an award of punitive damages.

## COUNT I

## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

87.     Plaintiff realleges paragraphs 1 through 86 and incorporates them by reference into Count I of this Complaint.

88.     The Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq., as amended by the Civil Rights Act of 1991, ("Title VII") makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of sex.

89.     By the conduct as described herein, Defendants subjected Plaintiff to sex discrimination in violation of Title VII.

<u>**COUNT II**</u>

**RETALIATION IN VIOLATION OF TITLE VII**

90.     Plaintiff realleges paragraphs 1 through 89 and incorporates them by reference into Count II of this Complaint.

91.     Title VII, specifically 42 U.S.C. § 2000e-3, makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice or has assisted or participated in another employee's claim of discrimination.

92.     Defendants retaliated against Plaintiff for her complaints of discrimination.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of Title VII.

<u>**COUNT III**</u>

**VIOLATION OF THE EQUAL PAY ACT**

93.     Plaintiff realleges paragraphs 1 through 92 and incorporates them by reference into Count III of this Complaint.

94.     The Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. Sections 206 and 207, makes it unlawful for an employer to pay lower wages or fringe benefits to employees of one sex than it does to similarly situated employees of the other sex.

95.     Plaintiff was paid lower wages than male employees in substantially equal jobs even though Plaintiff performed similar duties requiring the same skill, effort, and responsibility of male employees.

96.     The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

97.     Defendants intentionally paid Plaintiff less than they paid male employees who were performing substantially equal work.

98.     By the conduct as alleged herein, Defendants willfully discriminated against Plaintiff with respect to her wages in violation of the Equal Pay Act.

## COUNT IV

## RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

99.     Plaintiff realleges paragraphs 1 through 98 and incorporates them by reference into Count IV of this Complaint.

100.    The Equal Pay Act, 29 U.S.C. Section 215(a)(3), makes it unlawful for any person to discharge or in any manner discriminate against any employee because she complained of wage discrimination.

101.    Plaintiff complained of unfair wage practices.

102.    Defendants retaliated against Plaintiff for her complaints in violation of the anti-retaliation provisions of the Equal Pay Act.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of the Equal Pay Act.

## COUNT V

## SEX DISCRIMINATION IN VIOLATION OF THE IHRA

102.    Plaintiff realleges paragraphs 1 through 102 and incorporates them by reference into Count V of this Complaint.

103.    The Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-102(A), makes it unlawful to discriminate against any individual in the terms, privileges or conditions of employment on the basis of sex.

104.    The IHRA, specifically 775 ILCS 5/2-102(D), further provides that "[i]t is a civil rights violation [f]or any employer, employee, agent of any employer, employment agency or labor organization to engage in sexual harassment."

105.    By the conduct as alleged herein, Defendants subjected Plaintiff to sex discrimination, including sexual harassment, in violation of the IHRA.

106.    Under the IHRA, Defendants are also strictly liable for the sexual harassment of Plaintiff by Hess, whether or not they knew of the offending conduct.

<strong>COUNT VI</strong>

<strong>RETALIATION IN VIOLATION OF THE IHRA</strong>

107.    Plaintiff realleges paragraphs 1 through 106 and incorporates them by reference into Count VI of this Complaint.

108.    The IHRA, specifically 775 ILCS 5/6-101(A), makes it unlawful to retaliate against an employee who opposes what she reasonably and in good faith believes to be unlawful discrimination or sexual harassment, or because she has made a charge, filed a complaint, or participated in an investigation, proceeding, or hearing under the act.

109.    Defendants retaliated against Plaintiff for her complaints of discrimination and sexual harassment.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of the IHRA.

<strong>COUNT VII</strong>

<strong>VIOLATION OF THE ILLINOIS EQUAL PAY ACT</strong>

110.    Plaintiff realleges paragraphs 1 through 109 and incorporates them by reference into Count VII of this Complaint.

111.    The Illinois Equal Pay Act, 820 ILCS 112/1 et seq., makes it unlawful for an employer to pay lower wages to employees of one sex than it does to similarly situated employees of the other sex.

112.    Plaintiff was paid lower wages than male employees in substantially equal jobs

even though Plaintiff performed similar duties requiring the same skill, effort, and responsibility of male employees.

113.    The differential in pay between sexes was not pursuant to seniority, merit, quantity or quality of production, but was due to sex.

114.    By the conduct as alleged herein, Defendants willfully discriminated against Plaintiff with respect to her wages in violation of the Illinois Equal Pay Act.

## COUNT VIII

### RETALIATION IN VIOLATION OF THE ILLINOIS EQUAL PAY ACT

115.    Plaintiff realleges paragraphs 1 through 114 and incorporates them by reference into Count VIII of this Complaint.

116.    The Illinois Equal Pay Act, 820 ILCS 112/10, makes it unlawful for any person to discharge or in any manner discriminate against any employee because she complained of unfair wage practices.

117.    Plaintiff complained of unfair wage practices.

118.    Defendants retaliated against Plaintiff for her complaints in violation of the anti-retaliation provisions of the Illinois Equal Pay Act.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of the Illinois Equal Pay Act.

## COUNT IX

### RETALIATION IN VIOLATION OF SECTION 1981

119.    Plaintiff realleges paragraphs 1 through 118 and incorporates them by reference into Count IX of this Complaint.

120.    42 U.S.C. Section § 1981 ("Section 1981") makes it unlawful for an employer to discriminate against an employee who has opposed discrimination based on race, ancestry or

ethnic characteristics or has assisted or participated in another employee's claim of discrimination.

121.    Defendants retaliated against Plaintiff for her opposition to discrimination based on race, ancestry or ethnic characteristics.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of Section 1981.

## COUNT X

### RETALIATION IN VIOLATION OF THE ADA

122.    Plaintiff realleges paragraphs 1 through 121 and incorporates them by reference into Count X of this Complaint.

123.    The Americans With Disabilities Act ("ADA"), specifically 42 U.S.C. § 12203, makes it unlawful for any employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act."

124.    Defendants retaliated against Plaintiff for her opposition to discrimination based on disability.  By their conduct, Defendants subjected Plaintiff to unlawful retaliation in violation of the ADA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court find in her favor and against the Defendants as follows:

a.    Declare that the acts and conduct of Defendants violate Title VII, the Equal Pay Act, the IHRA, the Illinois Equal Pay Act, Section 1981 and the ADA, including the anti-retaliation provisions of those laws;

22

b.      Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c.      Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

d.      In the alternative to paragraph (c), reinstate Plaintiff with appropriate promotions and seniority and otherwise make Plaintiff whole;

e.      Award Plaintiff compensatory damages;

f.      Award Plaintiff punitive damages;

g.      Award Plaintiff liquidated damages;

h.      Award Plaintiff prejudgment interest;

i.      Award Plaintiff reasonable attorneys' fees, costs and disbursements; and

j.      Award Plaintiff such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: June 11, 2018

Respectfully submitted,

By:

*/s/Erika Pedersen*
Attorney No. 6230020

Erika Pedersen
Jill Weinstein
**PEDERSEN & WEINSTEIN LLP**
33 N. Dearborn Street, Suite 1170
Chicago, IL 60602
(312) 322-0710
(312) 322-0717 (facsimile)