# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LISA BETTS,

      Plaintiff,

      v.

OPTION CARE ENTERPRISES, INC.,
*et al.*

      Defendant.

Case No. 18-cv-4023

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

In 2004, Plaintiff Lisa Betts, a doctor of pharmacy and 25-year veteran of the medical field, co-founded a company specializing in immune globulin therapy. The company achieved great success. In 2009, she sold that company to Walgreen Company (Walgreens), which then in 2015 sold its majority interest to Madison Dearborn Partners (MDP). Throughout these ownership changes, Plaintiff remained at the company and continued to grow the product lines she oversaw. Then, on April 18, 2017, the company she co-founded more than a decade earlier, abruptly fired her.

Plaintiff now sues that company, Option Care, as well as Walgreens and MDP, alleging that Defendants discriminated against her because of her gender and wrongfully terminated her employment, in violation of various federal and state laws. Defendants move to dismiss [38] [41] [44]. For the reasons explained below, this Court denies Defendants' motions.

## I. The Complaint's Allegations[1]

### A. Plaintiff's Background

Plaintiff, who has a doctorate degree in pharmacy, has spent over 25 years working in the medical field. [35] ¶ 9. In 2004, Plaintiff co-founded one of Option Care's predecessor companies, a home infusion company specializing in immune globulin (IG) therapy. *Id.* ¶¶ 9–10. That company achieved financial success, generating $30 million in annual revenue within five years. *Id.* ¶ 10.

In 2009, Walgreens purchased Plaintiff's company and requested Plaintiff and her business partner stay on for at least two years to oversee its continued success (the two-year retention period). *Id.* ¶ 11. Walgreens operated the company under the name "Walgreens Infusion Services." *Id.* During the two-year retention period, Plaintiff served as the General Manager for the company's Lombard facility; in that role, she oversaw operations and helped grow the IG program into the largest revenue-generating infusible therapy for the company. *Id.* ¶ 13.

Following the two-year retention period, Plaintiff became the National Director of IG, and in that role, oversaw all operations and sales for IG therapy. *Id.* ¶ 14. The company's revenues grew from $64 million each year to $420 million each year. *Id.* ¶ 15. Plaintiff also grew the two product lines she oversaw and created and designed a data outcome IG software program, which she published in the Journal of Neurology. *Id.* ¶ 16.

---

[1] This Court takes these alleged facts from Plaintiff's amended complaint [35].

In 2015, Walgreens sold its majority ownership interest in the company to MDP (a private equity firm), retaining a minority interest. *Id.* ¶¶ 7, 12. After this sale, the company's new name became "Option Care." *Id.* ¶ 12.

## B. The Alleged Discriminatory Conduct

Plaintiff asserts that, despite her accomplishments and contributions to the company, Defendants discriminated against her because of her gender. *Id.* ¶ 19. Plaintiff alleges that Defendants' discrimination included:

- In September 2016, Option Care replaced Plaintiff with a male employee, Steven Hess, to fill a position Plaintiff held since 2009. Option Care paid Hess, who was less qualified than Plaintiff and had no experience in IG or infusion drugs, more than it paid Plaintiff for the same work. Upon hiring him, Option Care immediately gave Hess the more prestigious title of "Vice President," whereas Plaintiff held the subordinate title of "Director." *Id.* ¶¶ 21–23.

- Plaintiff interviewed Hess when Option Care considered hiring him. During the interview, Hess repeatedly disparaged another female employee. When Plaintiff voiced concern to her direct supervisor, Chief Operations Officer John Rademacher, he ignored her concerns. *Id.* ¶ 24.

- Hess engaged in gross misconduct, including sexual harassment, without repercussion. For instance, Hess told Plaintiff that he wanted to "spoon" with her. On another occasion, in the presence of another employee, Hess said that he and Plaintiff were "going to make love."

Another employee witnessed the latter comment and reported it to her supervisor. *Id.* ¶ 24.

- Hess undermined Plaintiff's authority and standing, ignoring Plaintiff's calls, text messages and emails. He did not treat male colleagues in a similar manner. *Id.* ¶ 25.

- Once Option Care removed Plaintiff from her position that it ultimately gave Hess, Option Care held her to unreasonable performance expectations. Specifically, Option Care told Plaintiff it expected her to increase revenues by over 15% within the next calendar year, under threat of termination, even though no one had ever attained that level of growth within one fiscal year. Further, Option Care made several decisions in 2017 that interfered with Plaintiff's efforts to increase revenues, including, for example, taking actions that decreased the company's market share. *Id.* ¶¶ 27–30.

- Option Care criticized Plaintiff on a weekly basis when revenue did not grow at the high rate it set; when Plaintiff tried to discuss the issues with Rademacher, he was dismissive and disinterested in addressing them. Plaintiff also unsuccessfully attempted to discuss the issues with CFO Mike Shapiro, who told her he had no time to speak with her, and CEO Paul Mastrapa, who told Plaintiff she was being defensive. *Id.* ¶ 32.

- Further, while holding Plaintiff to high performance expectations not similarly placed upon men, Option Care took away Plaintiff's administrative support staff. Option Care also took away Plaintiff's office in Lombard and gave it to Hess, forcing Plaintiff to work in Bannockburn, even though it was a 1–2 hour drive from her home. In contrast, Hess had the option of working at either location on a day-to-day basis. *Id.* ¶ 33.

- In fall 2016, Plaintiff asked Ted Raad, Option Care's Chief Commercial Officer, for a raise, but Raad asked her why she needed more money since she had done well after selling her company to Option Care. Similarly, in October 2015, Mastrapa commented on Plaintiff's continuing to work when she did not need the money. These executives did not direct such comments to male employees who chose to work but did not need to do so. *Id.* ¶¶ 35–37.

- Between 2009 and 2016, Plaintiff did not receive a single meaningful pay raise. Upon Plaintiff's information and belief, similarly situated men received better pay and meaningful raises over the years. Further, Plaintiff did not receive an opportunity to invest in the company when Walgreens sold its majority interest to MDP in 2015, even though lower-level employees and Plaintiff's former partner—a male—received such opportunities. *Id.* ¶¶ 38–39.

In addition to Plaintiff, Hess directed discriminatory conduct toward other employees. For instance, Hess made sexually explicit comments to at least one other female employee. *Id.* ¶ 24. He asked that female employee about her boyfriend and then, while making an obscene gesture with his hand and fingers, said, "Oh, you have a fuck buddy." *Id.* When the female employee expressed offense, Hess said, "We're at an after-hours event so you can't report me, plus I'm good friends with [the Senior Vice President of] Human Resources." *Id.*

Further, at a business meeting which Plaintiff attended, Hess mocked an Asian employee for her accent; that Asian employee teared up and told Hess that she did not think Human Resources would like what he just did to her. *Id.* Hess responded by telling the Asian employee that he was friends with the Senior Vice President of Human Resources. *Id.*

And, at yet another business meeting, Hess mimicked a disabled person by twitching his body and making offensive facial expressions. *Id.*

## C. Plaintiff's Complaints

Plaintiff protested Hess' conduct to him directly when she worked with him. *Id.* ¶ 50. Plaintiff also reported unlawful discrimination to Rademacher in February 2017, describing to him Hess' discriminatory and sexually harassing conduct toward her and other women. *Id.* ¶ 51. After speaking with Rademacher, Plaintiff reported unlawful discrimination to Mastrapa in late February 2017. *Id.* ¶ 52.

Plaintiff also told both Rademacher and Mastrapa that other employees were afraid to come forward because of Hess' close friendship with Mike Rude, the Senior

Vice President of Human Resources. *Id.* ¶¶ 24, 45, 53. Plaintiff told them that Hess frequently bragged about being connected to Human Resources and said that he would never get in trouble for what he did. *Id.* ¶ 53. Plaintiff also voiced concerns to both Rademacher and Mastrapa about other incidents, including Hess' discriminatory conduct toward an Asian employee and mimicking a disabled person. *Id.* ¶ 54. Despite Plaintiff's complaints, Rademacher told Plaintiff she needed to figure out a way to get along with Hess. *Id.* ¶ 55. And, although Mastrapa said he would look into Plaintiff's concerns, he took no disciplinary action against Hess. *Id.*

Plaintiff also reported other discriminatory conduct that occurred during her employment. In late 2016, Plaintiff spoke to Rademacher to protest Option Care's decision to fire a female employee because of the costs associated with insuring her sick children. *Id.* ¶ 56. Plaintiff asked Rademacher why the company fired her rather than a male employee when that woman was paid less than the male but performed better; Rademacher was furious with Plaintiff for challenging the termination. *Id.*

Plaintiff also spoke with Rude in October 2016 about a male employee who used company property to exchange sexually explicit text messages with a woman. *Id.* ¶¶ 44, 57. That male employee's messages, which included statements such as a reference to a "kissable" vagina, were included in a group text to various clients of Defendants. *Id.* When Plaintiff spoke with Rude about this incident, she told him she had a copy of the text messages. *Id.* ¶ 57. Rude told Plaintiff to delete the text messages. *Id.*

On other occasions, Plaintiff complained about her wages. *Id.* ¶ 58. For example, in late 2015, when Plaintiff discovered she had been denied the opportunity to invest in Option Care when other men were allowed to do so, she complained to Raad, who then reported Plaintiff's concerns to Rude. *Id.*

Similarly, in fall 2016, Plaintiff asked Rademacher for a raise; and, while she ultimately received a nominal raise, her salary remained well below that of other similarly situated men. *Id.* Rademacher lied to her that her new salary was "very close" to Hess' salary. *Id.* Rademacher then threatened Plaintiff with termination if she wanted more. *Id.*

## D.     Plaintiff's Termination

On April 18, 2017, Defendants fired Plaintiff. *Id.* ¶ 59. At that time, Mastrapa told Plaintiff that her "heart is not in it anymore." *Id.* ¶ 61. Plaintiff asserts that this reason is completely pretextual, given her outstanding job performance and dedication. *Id.* ¶ 62. Plaintiff had been recently recognized at the area Vice President meeting for being "passionate and engaged," and had received a plaque praising her engagement, excellence, and quality. *Id.* ¶ 63. Likewise, in early 2017, before Plaintiff complained about gender discrimination and sexual harassment, Rademacher gave Plaintiff a performance evaluation in which he found her work "completed satisfactorily." *Id.* ¶ 17.

Defendants subsequently offered different and inconsistent reasons for terminating Plaintiff. *Id.* ¶ 64. They said they fired Plaintiff due to "a reduction in

force," but then they claimed they fired Plaintiff for "poor performance, as a result of Option Care losing market share under her leadership." *Id.* ¶ 65.

Then, Option Care threatened to enforce a non-compete agreement that Plaintiff signed during her employment. *Id.* ¶ 69. They threatened Plaintiff with the agreement immediately upon firing her and repeated the threat after she retained counsel and expressed her intent to pursue legal claims. *Id.* Plaintiff alleges upon information and belief that Defendants did not similarly threaten male employees who did not complain about discrimination when they left the company, including Hess, who left the company in 2017 to work for a competitor. *Id.* ¶ 70.

### E.  Walgreens and MDP

From the beginning of Plaintiff's employment in 2009 until 2015, Walgreens owned 100% of Option Care; after 2015, it owned 49%. *Id.* ¶ 73. From 2015 on, MDP has owned 51% of Option Care. *Id.* ¶ 74.

Walgreens set Plaintiff's salary when it bought her company and hired her in 2009. *Id.* ¶ 75. Walgreens also placed Plaintiff in charge of operations at its Lombard, Illinois facility. *Id.* Further, up until 2015, Walgreens exclusively made all decisions regarding Plaintiff's employment and compensation. *Id.* ¶ 77.

In 2015, when MDP acquired Option Care, it offered an equity buy-in to lower level male employees but not to Plaintiff. *Id.* ¶ 80. MDP also set Plaintiff's sales goals for 2017. *Id.* ¶ 82.

Option Care's board of directors (board) discusses its liabilities and internal issues, including various employment matters. *Id.* ¶ 79. Since 2015, Walgreens' and

MDP's employees have comprised Option Care's board. *Id.* ¶¶ 77–78. Further, Option Care's CEO Mastrapa—who fired Plaintiff—was at all relevant times a member of MDP's board and reported directly to MDP. *Id.* ¶ 78.

### F. Administrative Charges

Plaintiff filed charges for discrimination and unlawful retaliation against Defendants with the EEOC on August 3, 2017. *Id.* ¶ 87. The EEOC issued Plaintiff a Notice of Right to Sue on February 26, 2018. *Id.* ¶ 88. The EEOC also cross-filed Plaintiff's discrimination charge with the Illinois Department of Human Resources (IDHR), and the IDHR adopted the EEOC's determination on May 29, 2018. *Id.* ¶ 89.

### G. The Amended Complaint's Causes of Action

Plaintiff brings a nine-count amended complaint. *See* [35]. She asserts claims against all Defendants for: (1) sex discrimination in violation of Title VII (Count I); (2) retaliation in violation of Title VII (Count II); (3) violation of the federal Equal Pay Act (federal EPA) (Count III); (4) retaliation in violation of the federal EPA (Count IV); (5) sex discrimination in violation of the Illinois Human Rights Act (IHRA) (Count V); (6) retaliation in violation of the IHRA (Count VI); (7) violation of the Illinois Equal Pay Act (IEPA) (Count VII); (8) retaliation in violation of 42 U.S.C. § 1981 (Count VIII); and (9) retaliation in violation of the Americans with Disabilities Act (ADA) (Count IX). *Id.*

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed.

R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Iqbal*, 556 U.S. at 678. In evaluating a complaint under Rule 12(b)(6), this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Id.* This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## III.  Analysis

Walgreens and MDP move to dismiss on the basis that Plaintiff fails to sufficiently plead an employment relationship with either party. [38] [44]. Additionally, all three Defendants move to dismiss Plaintiff's amended complaint on various substantive grounds. [41]. This Court addresses each motion in turn below.

### A.  Walgreens and MDP

Walgreens and MDP seek dismissal on the basis that Option Care was Plaintiff's sole employer during the relevant time period, and thus that Plaintiff cannot recover against either of them. [38] [44]. Plaintiff does not dispute that liability against those parties depends upon an employment relationship, but

11

maintains that both of those defendants exercised sufficient power and control over Plaintiff's employment to incur liability. *See* [58] at 4–5; [59] at 4–5.

### 1. Definition of "Employer"

At the outset, this Court sets forth how each relevant cause of action defines an employer-employee relationship.

Title VII, the ADA, and Section 1981. Counts I and II allege Title VII violations; Count IX alleges an ADA violation; and Count XIII alleges unlawful retaliation under 42 U.S.C. § 1981. [35] at 21, 25, 26. Both Title VII and the ADA define "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person." 42 U.S.C. § 2000e(b); 42 U.S.C.A. § 12111(5)(A). Further, the same standards apply to Title VII and § 1981 discrimination and retaliation claims. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). This Court thus looks to Title VII case law regarding the definition of "employer" for Plaintiff's Title VII, ADA, and Section 1981 claims.

It is well-settled that "multiple entities may be considered an employee's 'employer' for the purposes of Title VII liability." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008). An affiliated corporation may be considered an employer under Title VII, in addition to the direct employer, if the affiliate "directed the discriminatory act, practice, or policy of which the employee is complaining." *Id.* (quoting *Worth v. Tyer*, 276 F.3d 249, 260 (7th Cir. 2001)). A defendant may also be

considered a "de facto or indirect employer" if there is evidence that the defendant "controlled the plaintiff's employment relationship." *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995). To determine whether there existed an employer-employee relationship, courts "look to the economic realities of the work situation." *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 361 (7th Cir. 2016).

Federal EPA and IEPA. Counts III and IV assert that Defendants violated the federal EPA. [35] at 22–23. Like Title VII and the ADA, the federal EPA expressly contemplates that multiple entities may be employers. *Tamayo*, 526 F.3d at 1088; 29 U.S.C. § 203(d). The federal EPA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Similar to Title VII claims, courts look to the "economic reality" of a situation to determine the existence of an employer-employee relationship under the federal EPA, including considering the degree of control the purported employer asserted. *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 565 (7th Cir. 2009).

Count VII alleges an IEPA violation. [35] at 24. Under the IEPA, "'employer' means an individual, partnership, corporation, association, business, trust, person, or entity for whom 4 or more employees are gainfully employed in Illinois." 820 ILCS 112/5. Illinois courts look to common law to interpret the IEPA's definition of "employer," and under the common law, "the most important factor . . . is whether it has the right to control the manner and method in which the work is to be carried

out." *Delgado v. Life Time Fitness, Inc.*, 2012 IL App (2d) 110464-U, ¶ 33 (quoting *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1060 (Ill. App. Ct. 2005)).

IHRA. Counts V and VI allege violations under the IHRA. The IHRA imposes liability upon "employers," defined in relevant part as any "person employing 15 or more employees within Illinois during 20 or more calendar weeks within the calendar year of or preceding the alleged violation." 775 ILCS 5/2-101(B)(1)(a). Like the IEPA, courts look to common law factors, including "control of the manner in which work is done" in assessing the existence of an employment relationship. *Mitchell v. Dep't of Corr.*, 856 N.E.2d 593, 598 (Ill. App. Ct. 2006).

### 2. Walgreens and MDP Plausibly Meet the Definition of "Employer"

As explained above, as to every cause of action under which Plaintiff seeks relief, whether a party meets the definition of "employer" depends primarily upon whether it exerts control over a plaintiff's conditions of employment.

Plaintiff sufficiently alleges that Walgreens and MDP controlled her employment. For Walgreens, she pleads that, up until 2015, Walgreens exclusively made all decisions regarding her employment and compensation. [35] ¶ 77. Additionally, after Walgreens sold its majority interest to MDP in 2015, its employees partially comprised Option Care's board, which made decisions on Option Care's internal issues, including employment matters. *Id.* ¶¶ 75, 77.

Further, Plaintiff alleges that, due to its majority ownership since 2015, MDP has been actively involved with Option Care and its operations, and that MDP employees comprise a majority of Option Care's board. *Id.* ¶ 78. And importantly,

Mastrapa—Option Care's CEO who fired Plaintiff—was at all relevant times a member of MDP's board and reported directly to MDP. *Id.*

These allegations plausibly allege that Walgreens and MDP exerted sufficient control over Option Care's employment decisions and that both entities had the key powers to hire and fire. *See Harris v. Allen Cty. Bd. of Commissioners*, 890 F.3d 680, 684 (7th Cir. 2018) (noting in the context of an ADA employment discrimination case that the "key control powers are those of hiring and firing.") (internal quotation omitted); *see also Tamayo*, 526 F.3d at 1088 (allegations that defendant exerted sufficient control over the plaintiff's conditions of employment were sufficient to avoid dismissal of Title VII and federal EPA claims). Thus, this Court finds that Plaintiff plausibly alleges employment relationships with both Walgreens and MDP and denies Walgreens' and MDP's motions to dismiss. *See, e.g.*, *Brown v. Cook Cty.*, No. 17 C 8085, 2018 WL 3122174, at *7 (N.D. Ill. June 26, 2018) (collecting employment discrimination cases declining to dismiss claims without a full factual record to illuminate the exact extent of an employment relationship).

## B. Defendants' Motion to Dismiss

This Court turns next to Defendants' joint motion to dismiss on substantive grounds.

### 1. Statute of Limitations

Defendants first move to dismiss so-called untimely allegations from Plaintiff's Amended Complaint. [41] at 2; [61] at 1–4. Specifically, they contend that some of Plaintiff's sex-based discrimination allegations—which describe Defendants'

purported conduct from 2009 to 2017—are time-barred to the extent that Plaintiff did not timely file related charges with the EEOC and the Illinois Department of Human Rights (IDHR). [61] at 1–4.

To be sure, Title VII and the IHRA both require a plaintiff to timely file administrative charges before filing suit in federal court. That is, plaintiffs must file Title VII charges with the EEOC within 300 days of their employer's alleged misconduct, and IHRA charges with the IDHR within 180 days of the misconduct. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 839 (7th Cir. 2014); *Copeling v. Ill. State Toll Highway Auth.*, No. 12 C 10316, 2014 WL 540443, at *4 (N.D. Ill. Feb. 11, 2014).

But whether an individual may recover for acts that fall outside of the limitations period depends upon the type of act at issue. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).[2] In *Morgan*, the Supreme Court distinguished between two types of discriminatory acts: (1) "discrete" acts, and (2) acts that contribute to a "hostile work environment." *Id.* at 110–18. The Court held that each "discrete act" constitutes a separate actionable practice that restarts the clock for filing charges. *Id.* As such, "discrete discriminatory acts that fall outside the statute of limitations are time-barred even though they may relate to other discrete acts that fall within the statute of limitations." *Lucas v. Chicago Transit*

---

[2] Courts utilize the same analyses to adjudicate Title VII and IHRA discrimination claims. *See Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).

*Auth.*, 367 F.3d 714, 723 (7th Cir. 2004) (quoting *Morgan*, 546 U.S. at 112–13). Paradigmatic discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114.

In contrast, a hostile work environment claim, which is a type of continuing violation, "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122. Acts that contribute to a hostile work environment include "repeated conduct" that "occurs over a series of days or perhaps years." *Id.* at 115. Statutes of limitation do "not bar the court from considering conduct that occurred '10, 15, or 20 years ago,' so long as it formed a single unlawful employment practice that reached into the statutory period." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) (quoting *Pruitt v. City of Chicago*, 472 F.3d 925, 928 (7th Cir. 2006)).

Consistent with her amended complaint, and as stated in her brief and at oral argument, Plaintiff intends to prove her discrimination claims by demonstrating both that she suffered disparate treatment and that Defendants' alleged sexual harassment created a hostile working environment. *See* [57] at 7–8.[3] As to the latter, the Seventh Circuit has noted that sexual harassment is "not limited to acts of sexual

---

[3] Defendants take issue with the fact that Plaintiff did not expressly plead the words "hostile work environment" in her amended complaint. [61] at 3. But a plaintiff need not do so to satisfy federal pleading standards. *See Jajeh v. Cty. of Cook*, 678 F.3d 560, 567 (7th Cir. 2012) (holding that a hostile work environment claim "was properly raised in the complaint" even though the plaintiff did not expressly plead those words). Here, as discussed in more detail below, this Court finds that Plaintiff pleads sufficient facts from which this Court infers that Plaintiff proceeds under a hostile work environment theory.

desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003) (internal quotation omitted).

Under that standard, Plaintiff's allegations plausibly set forth a continuing and repeated pattern of conduct alleged sexual harassment that continued up until her termination in April 2017. *See* [35] ¶¶ 24–26, 28–34, 35–37, 43–49, 50–58. Because at least one of these acts occurred within the statutory time frame, none of these allegations are time-barred under *Morgan*. *See Morgan*, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

Further, as the Court in *Morgan* recognized, plaintiffs can use "prior acts as background evidence in support of a timely claim." 536 U.S. at 113; *see also Mathewson v. Nat'l Automatic Tool Co.*, 807 F.2d 87, 91 (7th Cir. 1986) (holding that "evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer"). Therefore, even if any of Plaintiff's allegations constitute untimely acts, this Court declines to dismiss them, because they may constitute background evidence to support her timely claims.

## 2.     Sexual Harassment Claims

Defendants next contend that Plaintiff's Title VII and IHRA sexual harassment claims should be dismissed because she did not allege that she experienced severe and pervasive conduct. [42] at 4; [61] at 4–6. Defendants characterize Plaintiff's allegations as amounting to little more than "perceived workplace slights, or boorish behavior." [61] at 5.

To state an actionable Title VII sexual harassment claim under a hostile work environment theory, a plaintiff must allege that her co-worker or supervisor harassed her because of her sex, and that the harassment was "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462–63 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). The Seventh Circuit has instructed that "harassing conduct does not need to be both severe *and* pervasive"; rather, one incident may be enough. *Jackson v. Cty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). Moreover, "gender-based comments and epithets, when used pervasively in the workplace, can meet the standard for severe or pervasive harassment." *Passananti v. Cook Cty.*, 689 F.3d 655, 668 (7th Cir. 2012); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789 (7th Cir. 2007) ("anti-female remarks are severe enough to support a hostile work environment claim.").

Under these standards and at this early stage of the proceedings, this Court disagrees with Defendants' characterization that Plaintiff's allegations can only amount to "perceived workplace slights" or "boorish behavior." *Contra* [61] at 5.

Plaintiff alleges that her supervisors made a variety of sexually explicit and gender-based demeaning comments in her presence. *See, e.g.*, [35] ¶¶ 24, 35–37. Accepting these allegations as true, and drawing inferences in her favor, this Court finds that, prior to the benefit of full discovery and a complete factual record, Plaintiff sufficiently pleads that the harassment was severe or pervasive for the purposes of a motion to dismiss. *See, e.g., Savoy v. BMW of N. Am., LLC*, 313 F. Supp. 3d 907, 916 (N.D. Ill. 2018) (finding that the plaintiff sufficiently alleged conduct that was severe or pervasive where she pled "several instances in which her supervisor uttered racist or racially-charged remarks").

### 3.    EPA Pay Differential Claims

Defendants next seek dismissal of Counts III and VII, Plaintiff's federal EPA and IEPA claims. [42] at 4–7.

To succeed on those claims, Plaintiff must plead and prove: "(1) that different wages are paid to employees of the opposite sex; (2) that the employees do equal work which requires equal skill, effort, and responsibility; and (3) that the employees have similar working conditions." *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 912–13 (7th Cir. 2002) (quoting *Fallon v. State of Ill.*, 882 F.2d 1206, 1208–09 (7th Cir. 1989)); *Wanless v. Ill. Human Rights Comm'n*, 695 N.E.2d 501, 503 (Ill. App. Ct. 1998) ("When analyzing claims of discrimination under the [IHRA] Act, Illinois courts have looked to the standards applicable to analogous federal claims.").

Defendants contend that Plaintiff fails to allege that Defendants paid superior wages to a man who performed equal work. [42] at 4–7. Defendants' argument can

be distilled to their theory that one of Plaintiff's alleged male comparators—Hess—held a different job title than the Plaintiff (Vice President rather than Director). [61] at 7. Defendants' position is untenable, however, because Plaintiff need not show that she and her male comparator had the exact same job titles. *Fallon v. State of Ill.*, 882 F.2d 1206, 1208 (7th Cir. 1989). Rather, Plaintiff need only show that she and her male comparator had "substantially equal" duties. *Id.*

Here, Plaintiff alleges that in September 2016, Hess replaced Plaintiff in the position she had held since 2009. [35] ¶ 21. Plaintiff further alleges that Option Care paid Hess more in base salary and bonus than it paid Plaintiff "for doing the same work" and holding "the same job." *Id.* ¶ 22. These allegations sufficiently establish Hess as a male comparator at the pleadings stage. *See Fallon*, 882 F.2d at 1208.; *see also Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994) ("This differential between the plaintiff's salary and that of her successors is sufficient to support an action under the EPA.").

Moreover, the primary case upon which Defendants rely is distinguishable. In *Parks v. Speedy Title & Appraisal Review Services*, the court found that the plaintiff, a female, failed to state a federal EPA claim because she alleged that she was paid less than both male *and* female coworkers. 318 F. Supp. 3d 1053, 1069 (N.D. Ill. 2018). Here, in contrast, Plaintiff alleges a gender-based pay disparity.[4]

---

[4] Defendants also argue that Walgreens and MDP should be dismissed from the EPA claims because Plaintiff's amended complaint contains no allegations that they controlled anyone's pay but Plaintiff's. [61] at 8. This Court rejects this argument because Plaintiff alleges that all Defendants controlled her pay and/or that of her male comparators. [35] ¶¶ 38–41, 75–78, 80, 82.

### 4.    Plaintiff's Federal EPA Retaliation Claim

Finally, Defendants move to dismiss Plaintiff's federal EPA retaliation claim (Count IV).  [42] at 7.   To establish a prima facie case of retaliation, a plaintiff must plead that: (1) she engaged in protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) a causal connection exists between the adverse employment action and her participation.  *Bell v. EPA*, 232 F.3d 546, 554 (7th Cir. 2000).  Here, Plaintiff asserts that Defendants retaliated against her after she made two oral complaints about pay: (1) a late 2015 complaint to Raad about being denied the opportunity to invest in Option Care; and (2) a fall 2016 complaint to Rademacher, requesting a pay raise so that her earnings would be comparable to similarly situated men.  [35] ¶ 58.

Defendants argue that Plaintiff did not adequately allege that she engaged in protected activity under the EPA, because Plaintiffs' alleged complaints about her pay (1) were not filed, in writing; and (2) consist solely of her general dissatisfaction with wages, rather than a complaint about gender disparity.  [42] at 7; [61] at 10–11.

This Court disagrees with both points.   First, contrary to Defendants' argument, the Supreme Court has expressly recognized that the EPA's anti-retaliation provision protects oral complaints made to one's supervisors.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011).  Therefore, Plaintiff need not have filed in writing any of those complaints to assert them as protected activity.

Second, while Defendant correctly argues that a complaint regarding general dissatisfaction over wages generally does not "trigger protection of the statute," *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 985 (N.D. Ill. 2014), Plaintiff's allegations reveal that her complaints went beyond such general dissatisfaction. For instance, she specifically alleges, with respect to the fall 2016 complaint to Rademacher, that she asked for a raise "so her earnings would be comparable to those of similarly situated men, particularly Hess." [35] ¶ 58. Her complaint therefore was directed specifically at gender-based pay discrepancies, rather than general dissatisfaction about pay.

Defendants also argue that Plaintiff fails to plead causation because neither of the above incidents—which occurred approximately three years and seven months, respectively, before Plaintiff's termination—could plausibly be linked to the Defendants' decision to terminate her. [61] at 11. This Court rejects this argument, too, because Plaintiff plausibly alleges that Defendants terminated her *precisely* because she complained: She states that, after she complained to Rademacher in the fall of 2016, Rademacher gave her a nominal raise but then threatened her with termination if she wanted more. [35] ¶ 58.

## IV. Conclusion

This Court denies Defendants' motions to dismiss [38] [41] [44].  All dates and deadlines stand.

Dated: January 15, 2019

Entered:

John Robert Blakey
United States District Judge